# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Manhattan Group, LLC,                          Civ. No. 10-3918 (PJS/JJK)

        Plaintiff,

v.

                              **REPORT AND RECOMMENDATION**

Automoblox Company, LLC
and Patrick Calello,

        Defendants.

J. Thomas Vitt, Esq., and David Y. Trevor, Esq., Dorsey & Whitney LLP, counsel for Plaintiff.

Bridget A. Sullivan, Esq., and Todd L. Gurstel, Esq., Gurstel, Staloch & Chargo, P.A., counsel for Defendants.

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to Fed. R. Civ. P. 65, Plaintiff Manhattan Group, LLC seeks a preliminary injunction order against Defendants Automoblox Company, LLC, and Patrick Calello.  An evidentiary hearing was held and testimony was presented before this Court on December 7, 2010.  Counsel's oral arguments were heard on December 3 and 8, 2010.

      This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.  For the reasons stated below, this Court recommends that Plaintiff's Motion for Preliminary Injunction (Doc. No. 6), be denied.

## INTRODUCTION

Plaintiff Manhattan Group, LLC ("Manhattan Toy") seeks injunctive relief against Defendants Automoblox Company, LLC ("AMB") and Patrick Calello ("Calello") pending the resolution of an arbitration scheduled for March of 2011. Manhattan Toy argues that it has an exclusive worldwide license to manufacture, market and sell Automoblox brand toys, under its Product Alliance, License, Manufacturing and Distribution Agreement with AMB ("License Agreement") through the year 2011. Manhattan Toy maintains that AMB breached its contractual obligations under the License Agreement by failing to honor the automatic extension provision of the License Agreement; failing to comply with specific limits on AMB's own rights to sell Automoblox; and failing to fulfill additional obligations relating to the design, manufacture, marketing and sales of Automoblox. Manhattan Toy contends that AMB's actions will continue to cause irreparable harm to its good will and reputation unless AMB is enjoined from certain activities before the start of the major toy show season in January and February of 2011.

AMB counters that the entire License Agreement is void and unenforceable and has been cancelled by AMB in October 2010. AMB argues that back in 2008, when the parties were negotiating an expansion of Manhattan Toy's exclusive license rights to include the North American specialty-store market, Manhattan Toy misrepresented the level of sales of the Automoblox toys it had achieved in other toy markets Manhattan Toy was already exclusively

sellin—particularly the international market.  AMB thus contends that Manhattan Toy fraudulently induced it to enter into an amendment of the License Agreement, which greatly enhanced Manhattan Toy's rights to manufacture, market, and distribute Automoblox.  AMB's position is that, as a result of these alleged misrepresentations by Manhattan Toy, AMB is not required to honor the automatic extension of the License Agreement when the term of License Agreement ends on December 31, 2010.  AMB also asserts that Manhattan Toy breached the License Agreement by selling Automoblox to discounters and in territories excluded under the License Agreement.

At the same time that this lawsuit was commenced in September 2010, Manhattan Toy also filed a demand for arbitration pursuant to the rules of the American Arbitration Association ("AAA").  The parties have selected an arbitrator—who has conducted a pre-hearing conference—agreed to an extensive discovery schedule, and set a five-day hearing to take place in New York starting March 14, 2011.

## BACKGROUND

Automoblox is a line of wooden toy cars designed and developed by Defendant Patrick Calello, the founder and principal owner of AMB, a New Jersey company.  (Doc. No. 1, Pl.'s Compl. ("Compl.") ¶¶ 5-6.)  The Automoblox cars are premium priced toys designed to incorporate classic wooden toy car features and provide children with a challenging, interactive play experience:

Automoblox is the reinvention of the classic wooden car
fused with modern design, transformed into a mix-and-
match construction system that allows children to
design cars of their own style.  Developed in conjunction
with leading child development psychologist,
Automoblox delivers significant developmental benefits
through its fundamental design and its patented
interlocking connection system.

(Doc. No. 17, Berg Decl., Ex. 1 ("License Agreement") 22.)

Manhattan Toy is a Minneapolis-based toy company that sells various lines
of children's toys including, as a result of the License Agreement, Automoblox.
(Compl. ¶¶ 4 and 12.)  In 2008-2009, Manhattan Toy entered into the License
Agreement with AMB that gave Manhattan Toy the exclusive worldwide rights to
manufacture, market and sell Automoblox products in designated distribution
channels.  (*Id.* ¶¶ 2, 14-15.)  In exchange, Manhattan Toy was required to pay
royalties to AMB on the sale of Automoblox.  (*Id.*)

There were two phases to the License Agreement.  (*Id.* ¶ 15.) Under
Phase I, which began as soon as the License Agreement was executed,
Manhattan Toy had license rights to:  (a) international channels, with some
limited exclusions; (b) wholesale channels in Canada; and (c) national accounts,
including Target Corporation, in North America.  (License Agreement ¶ 3.1.)
During Phase I, AMB continued selling to the North American specialty stores
channel, which includes approximately 5,000 independent gift, toy, and book
stores of various types and sizes. (*Id.*)  Under the License Agreement, Manhattan
and Automoblox agreed to review the performance of Phase I on or before

December 31, 2008 to determine whether Manhattan Toy's exclusive rights to sell the products should be extended to the North American specialty-store market is what was described as "Phase II" of the License Agreement. (*Id.* ¶ 3.2.) The expected launch date for Phase II was March 31, 2009. (*Id.*) The License Agreement provided that both AMB and Manhattan Toy had to agree on satisfactory performance to date to trigger Phase II (i.e., to trigger Manhattan Toy's right to take over from AMB the exclusive right to sell the toys to the North American specialty-store market), but that AMB could not unreasonably withhold the transition to Phase II should Manhattan Toy's sales of Automoblox exceed $2.5 million during 2008. (*Id.*) In Phase II, Manhattan Toy would have the exclusive right to all of the remaining North American channels, including the important North American specialty stores channel. (*Id.*; Doc. No. 9, Decl. of Hugh Kennedy ("Kennedy Decl.") ¶ 11.)

    The initial term of the License Agreement is to end on December 31, 2010, but Manhattan Toy may extend year to year, at its option, as long as it pays AMB a minimum royalty fee. (License Agreement ¶ 6.1; Doc. No. 10, Decl. of Mike Klein ("Klein Decl.") ¶ 12.) On June 16, 2010, Manhattan Toy notified AMB that it was going to exercise the option to extend the exclusive License Agreement through the year 2011. (Klein Decl. ¶ 13.) On July 2, 2010, AMB responded with a letter accusing Manhattan Toy of having made fraudulent misrepresentations in 2008 in connection with obtaining license rights to sell Automoblox products in Phase II to the North American specialty store market. (*Id.* ¶¶ 14-15.)

Specifically, AMB contends that in August 2008, Manhattan Toy misrepresented the level of success it was having selling the Automoblox and the likelihood that it was going to reach the $2.5 million actual sales level in year 2008. (*Id*. ¶ 18; Compl. ¶ 25.) As a result, said AMB, Manhattan Toy did not have the right to automatically extend the initial term of the License Agreement. (Klein Decl. ¶¶14-15, Ex. 2.)

The License Agreement contains the following mandatory arbitration clause:

> Except as to any injunctive relief sought by either party under this Agreement, any controversy or claim arising out of or relating to this Agreement, or the threatened or actual breach thereof, termination or validity thereof, which remains unresolved after good faith negotiations as provided for in Section 11.12(a) shall be settled by arbitration in accordance with rules of the American Arbitration Association. The place of arbitration shall be Manhattan, New York.

(License Agreement ¶ 11.12(b).) On September 14, 2010, Manhattan Toy notified AMB that it had commenced arbitration seeking declaratory relief with respect to its contractual right to extend the exclusive license rights and for money damages, and that it had also commenced this lawsuit for injunctive relief.

AMB responded with a letter on October 2, 2010 notifying Manhattan Toy that the License Agreement "is hereby cancelled and as a result is null and void." (Klein Decl., Ex. 4.)

Pursuant to the rules of the American Arbitration Association, the parties selected the arbitrator, New York attorney Sidney Bluming, and a five-day

hearing has been set to commence on March 14, 2011.  (Doc. No. 35, Decl. of J. Thomas Vitt ("Vitt Decl.") ¶ 2, Ex. 1.)  The arbitrator has already held a preliminary conference and the parties agreed to an extensive prehearing discovery schedule.  (*Id.*)  At the preliminary conference, Manhattan Toy attempted to expedite the arbitration hearing.  (*Id.*)  The arbitrator declined to move up the arbitration date, noting that "the substantive issues, to include breach of contract, fraud and misrepresentation claims, among others, do not lend themselves to such expedited resolution, especially considering the extensive discovery the parties agreed to conduct." (*Id.*)  He also cited Manhattan Toy's pending motion for injunctive or emergency relief in this District as a basis for denying its request to expedite the arbitration:  "the matter of emergent relief has already been presented before the Federal Court in Minnesota and the same matter cannot be heard in this proceeding".  (*Id.*)

In seeking injunctive relief, Manhattan Toy requests, among other things, that this Court:

(1) enjoin AMB from "any action, statement or communication purporting to terminate, cancel, revoke or otherwise put an end to the License Agreement and First Amendment between Manhattan Toy and AMB";

(2) enjoin AMB from "stating, implying or otherwise communicating to any third party that Manhattan Toy's license rights with regard to Automoblox

products have been terminated, cancelled, revoked or otherwise impaired or diminished;[1]

(3) enjoin AMB from "licensing or attempting to license the right to market or sell Automoblox products to any third party";

(4) enjoin AMB from "making any sales of Automoblox products, either retail or wholesale, to any party, except as expressly permitted by Section 2.4 of the License Agreement...";

(5) order AMB to "provide Manhattan Toy with the opportunity to sell any Automoblox model designs developed by AMB and Calello now and in the future, including, but not limited to: 53105-Mini Highcroft trailer set, 53106-Mini Hot Rod trailer set, and 55107-Mini C9-S Berlinetta, 985011-Hot Rod HR1 – Full Size, 985012- Hot Rod HR2 – Full Size, 985013 Hot Rod HR3 – Full Size"; and

(6) order AMB to "provide Manhattan Toy, within 10 days of the date of this Order, with [a] a list of all retail sellers, distributors or others contacted by AMB, Calello or Brennan, to whom AMB, Calello, or Brennan stated or implied that Manhattan Toy was no longer the exclusive licensee of Automoblox products, or to whom AMB, Calello, or Brennan attempted to sell Automoblox products in competition with Manhattan Toy; and [b] a written statement, signed by Calello in

---

[1]     These third parties "include, but are not limited to, actual and potential retail sellers of Automoblox products, actual and potential distributors of Automoblox products, actual and potential purchasers of Automoblox products, and actual and potential manufacturers of Automoblox products." (Pl.'s Proposed Order).

his personal capacity and on behalf of AMB, stating that Manhattan Toy remains the exclusive licensee of Automoblox products."  (Pl.'s Proposed Order).

For the reasons set forth below, this Court recommends that Manhattan Toy's motion for preliminary injunction be denied.

## ANALYSIS

### I.    Preliminary Injunction Pending Arbitration

In the traditional preliminary injunction motion in federal court, where a party is seeking injunctive relief preliminary to the court's ultimate resolution on the merits, the courts in this circuit apply the familiar four-part test set forth in *Dataphase Sys. Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  The pendency of an arbitration to resolve the merits of the parties' dispute requires us to change this traditional approach.  As the Eighth Circuit noted in *Peabody Coalsales Company v. Tampa Electric Company*, 36 F.3d 46, 48 (8th Cir. 1994):

> Though the parties have characterized the requested relief as a preliminary injunction, it is not "preliminary" in the traditional sense.  It is not preliminary to the court's ultimate resolution of the merits.  The merits are properly left to the arbitrators and *Hovey* directs that we avoid the delay that would result from application of the *Dataphase* criteria.

*Id.* (citing *Merrill Lynch Pierce Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286, 1291 n.10 (8th Cir. 1984)).  The courts must be particularly cautious in granting preliminary injunctive relief when the parties have contracted to resolve their dispute in arbitration because their dispute is then governed by the Federal Arbitration Action (the "FAA"), and the role of the court must be "a very limited

one." *Id.* at 47.  Care must be taken not to thwart the "unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to the contract, be speedy and not subject to delay and obstruction in the courts." *Hovey*, 726 F.2d at 1286 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 (1967)).  "[T]he judicial inquiry requisite to determine the propriety of injunctive relief necessarily would inject the court into the merits of issues more appropriately left to the arbitrator." *Id.*

The threshold issue that this Court must address is whether the issuance of the preliminary injunction requested by Manhattan Toy pending the outcome of the March 14, 2011 arbitration would embroil this Court in the merits of the case and thus run counter to the FAA.  The courts in the Eighth Circuit have been careful to avoid such interference with the arbitration process where, as here:  (a) a contract has been terminated by one party; (b) the contract contains a mandatory arbitration clause; (c) the terminated party seeks ongoing performance of the contract preliminary to arbitration; and (d) the contract contains no provision requiring the parties to continue their contractual obligations during the dispute resolution process.  *See Peabody*, 36 F.3d at 48; *Manion v. Nagin*, 255 F.3d 535 (8th Cir. 2001); *Clarus Med. LLC v. Myelotec, Inc.*, No. Civ. 05-934, 2005 WL 2206125, at *2-3 (D. Minn. Sept. 9, 2005); *Eco*

*Water Sys., LLC v. Kris, Inc.*, No. 06-3105, 2007 WL 1321851, at *1, *3-*5 (D.

Minn. 2007)[2].

As the Eighth Circuit stated in *Manion*:  "In a case involving the Federal

Arbitration Act (FAA) courts should not grant injunctive relief unless there is

"qualifying language" which permits it."  *Manion*, 255 F.3d at 538-39.  A contract

that simply acknowledges that the parties may seek injunctive relief outside the

arbitration does not contain such "qualifying language."  "Qualifying language"

has been defined as "language which provides the court with clear grounds to

grant relief without addressing the merits of the underlying arbitrable dispute."  *Id*.

at 538-539 (citing *Peabody*, 36 F.3d at 47 n.3).

In *Manion*, a terminated executive sought interim relief in district court to

restore his salary and benefits pending a mandatory arbitration.  The district court

denied his relief.  The Eighth Circuit concluded that the language of an

employment agreement allowing the parties to request "interim. . . and injunctive

relief in case of any breach" was not sufficient "qualifying contractual language"

to allow the plaintiff to seek injunctive relief in the district court:

> It is true that the Agreement contemplates the possibility
> of interim judicial relief in the event of a dispute between

---

[2]     Unfortunately, neither party cited this important body of precedent about
how the Court should deal with preliminary injunction motions of this sort when
the FAA applies, and there is an impending arbitration.  The parties ignored it
and just relied upon the traditional *Dataphase* factors.  Judge Frank ran into a
similar problem in *Clarus*, where he observed that "it [is] somewhat bothersome
that the crucial issue in this case was raised primarily at oral argument on the
matter."  *Clarus,* 2005 WL 2206125, at *3.  At least in that case it was raised at
all.

the parties. It does not provide that a party is
automatically entitled to injunctive relief, however, but
only that a party may request such relief. Unlike the
*Peabody* contract, it does not specify that the parties'
"respective obligations ... shall be continued in full by
the parties during the dispute resolution process." The
provision allowing a party to request interim relief has
been fulfilled since Manion filed a motion for a
preliminary injunction and it was ruled on by the district
court.  Another provision in the Agreement states that a
party is entitled to injunctive relief "in case of any
breach," but in order to issue such relief the district court
would have been required to determine that a breach
had occurred and to have made a determination on the
merits of the underlying dispute, an issue for the
arbitrator.

*Manion*, 255 F.3d at 538-39.

The Eighth Circuit distinguished its earlier decision in *Peabody*, where the

court found that there was clear qualifying language in the parties' coal supply

contract to conclude that the parties had contemplated continued performance

during the pendency of the dispute resolution process.  *Id*. at 539; *Peabody*, 36

F.3d at 47 ("unless otherwise agreed in writing by Buyer and Seller performance

of their respective obligations under this Agreement shall be continued in full by

the parties during the dispute resolution process").  But no such "qualifying

language" was present in *Manion* and the preliminary injunction was denied. *Id*.

In *Clarus*, 2005 WL 2206125, at *2-3, a distributor of medical products

under an exclusive license with defendant sought a preliminary injunction to

require the defendant to supply it with product and comply with the terminated

license agreement pending a mandatory arbitration.  The plaintiff distributor

claimed that it was running out of product, could not fill customer orders, and that defendant was advertising in trade publications to sell the products that were exclusive to plaintiff. Relying on *Manion*, the district court held that the language of the license agreement, which contained a general provision allowing injunctive relief, was insufficient to permit the court to entertain plaintiff's request for injunctive relief: "The language of the License that allows for injunctive relief is a general clause and does not specify the ground upon which the Court may grant such relief. … Nor does it allow the Court to grant relief without the Court addressing the merits of the underlying dispute." *Id.* (citing *Manion*, at 539). There, the parties' license agreement provided that "[e]xcept as otherwise provided in Section 20(d) below, any and all disputes arising out of or in connection with this Agreement shall be solely and finally settled by arbitration…." Section 20(d), in turn, stated: "Notwithstanding any provision of this section to the contrary, each party shall be entitled to seek injunctive and other equitable relief in any court or forum of competent jurisdiction to enforce the provisions of this Agreement . . ." *Id.* at *2. Finding that the "the language providing for injunctive relief is not legally distinguishable from that in *Manion,*" the court denied plaintiff's preliminary injunction request: "Because the License does not have 'qualifying contractual language' that permits the Court to consider Clarus' request for injunctive relief the Court need not address further the merits of Clarus' request." *Id.* at *3.

The same result was reached in *Eco Water.* There, a franchisor of a water conditioner and drinking water equipment business terminated a 17-year relationship with a franchisee and sought to enforce, as is common in franchise termination cases, the post-term covenants that would have required the franchisee to stop using the franchisor's trademarks and service marks. *Eco Water*, 2007 WL 1321851, at *2. The franchise agreement included a mandatory arbitration clause that clearly governed the termination dispute. Another portion of the franchise agreement provided that the franchisee "agrees that its failure to comply with its post-term obligations will cause [Eco] to suffer irreparable injury." *Id.* Thus, the franchisor had "the right to petition a court of competent jurisdiction for the entry of temporary or permanent injunctions enforcing the provisions of this article 10 without posting a bond." *Id.*

Relying on *Manion*, the court found that the language of the franchise agreement did not contain sufficient "qualifying language" that automatically entitled Eco to seek injunctive relief upon the franchisee's failure to comply with its post-termination obligations:

> [T]o determine the likelihood of success on the merits, questions regarding the validity of Eco's termination of the Agreement and the extent of KRIS's failure to comply with its post-termination obligations must be examined. Consequently, injunctive relief concerning the post-termination obligations of KRIS cannot be ordered without the Court entangling itself in the merits of the claims of the parties regarding the validity of the termination and the related conduct of the parties.

*Id.* at *3-*5. In short, the court concluded that the language of the agreement did

not permit plaintiff to bypass arbitration, even temporarily, by seeking to obtain injunctive relief from the district court.  *Id.*

Similar to the contracts in *Manion*, *Clarus*, and *Eco Water*, the License Agreement here permits the parties to seek injunctive relief:

> Except as to any injunctive relief sought by either party under this Agreement, any controversy or claim arising out of or relating to this Agreement, or the threatened or actual breach thereof, termination or validity thereof, which remains unresolved after good faith negotiations as provided for in Section 11.12(a) shall be settled by arbitration. . .

(License Agreement ¶ 11.12(b).)  But just like the contracts in *Manion*, *Clarus*, and *Eco Water*, the parties' License Agreement does not contain the "qualifying contractual language" that makes it appropriate for this Court to grant Manhattan Toy's request for injunctive relief.   The License Agreement specifies no grounds on which this Court may grant injunctive relief without weighing the underlying merits.   To determine whether and what type of injunctive relief is appropriate, this Court would have to embroil itself in the merits of the underlying arbitrable dispute.  At the very least, this Court would have to make a preliminary determination of the likelihood of success on the merits of AMB's claim that it was correct to "cancel" the License Agreement in October 2010, because of Manhattan Toy's alleged fraud.  This would require at least some review of the fraud claim and the parties' conduct between 2008 and 2010.  Beyond that, this Court would have to weigh each party's contention that the other is currently

breaching the License Agreement in numerous ways—such as AMB's claim that Manhattan Toy is selling to discounters and Manhattan Toy's claim that AMB has not been giving Manhattan Toy access to newly designed toy models.  This the Court cannot do without the "qualifying language" required by *Peabody*, *Manion*, and their progeny.

## II. Irreparable Harm

Even if this Court were to disregard the fact that the License Agreement contains no "qualifying language" requiring the parties to perform their obligations pending the March arbitration, it would still deny Manhattan Toy's motion for injunctive relief.  Based on the evidence presented by the parties, this Court cannot conclude, under the traditional *Dataphase* analysis, that Manhattan Toy will suffer irreparable harm unless the sweeping injunctive relief it now seeks is granted.

One way Manhattan Toy claims that it will be harmed is that AMB may become its competitor in major customer markets that have over the past two years been exclusively handled by Manhattan Toy, including the international channel, North American wholesale channels, the national book store chains and, of course, the approximately 5,000 independent specialty stores that were then taken over by Manhattan Toy in Phase II.  Manhattan Toy is particularly concerned about harm that might occur if AMB starts selling to those customers before or during the major toy trade shows in January and February 2011.

But Manhattan Toy's claims of irreparable harm are unfounded.  First, there is nothing to suggest that AMB can or will do anything to stop or slow down Manhattan Toy's sales of Automoblox products.  After the purported cancellation of the License Agreement on October 10, 2010, AMB took no action to stop Manhattan Toy from selling the toys.  It was Manhattan Toy, not AMB, that brought the injunction action and initiated arbitration.  Indeed, AMB has every incentive to ensure that Manhattan Toy sells as many toys as possible:  AMB gets a 15% royalty on each sale, a license fee level that Manhattan Toy contends is at the top of the toy industry, on par with the royalties Disney commands for a license to its famous characters.  Even after the cancellation notice October 10, 2010, AMB accepted a royalty payment by Manhattan Toy in late October of 2010.

Second, there is no evidence that AMB is even equipped to start the difficult task of putting together a sales force to sell the products to the thousands of toy stores, book stores, etc., and to put a dent in Manhattan Toy's sales efforts.  When the specialty store channel distribution was turned over to Manhattan Toy in early 2009, AMB eliminated its own sales force and turned its attention to product design and development and now employs only a small staff. Manhattan Toy, on the other hand, distributes multiple lines of toys and utilizes a sales force of over 100 sales representatives in the field.  It is highly unlikely that AMB could hire a large, skilled sales force in the next few weeks and "irreparably harm" Manhattan Toy's marketing and sales efforts.

17

Manhattan Toy cites one incident with one customer to support its claim of irreparable harm. On October 11, 2010, a "consultant" for AMB named Pat Brennan contacted Barnes & Noble and inquired about Barnes & Nobel's product needs, saying that he was consulting with Automoblox through the end of the year "to get a sales team in place" and was trying to see who needs what. (Klein Decl., Ex. 7.) When Barnes & Noble stated that it ordered the product from Manhattan Toy and had given projections through the end of the year, Brennan said he did not know the specifics of Manhattan Toy and Automoblox "relationship ending" but that he would "get the straight scoop on this and [] get back to you." (*Id.*) That appeared to end the matter. At the preliminary injunction hearing, Patrick Calello, AMB's principal, testified that he has had little or no contact with Pat Brennan and does not know of any progress Brennan made in putting together a sales force.[3] This does not amount to a sufficient enough showing of irreparable harm to justify the injunction sought by Manhattan Toy.

Manhattan Toy's argument that it will be irreparably harmed unless this Court enjoins AMB from terminating Manhattan Toy's exclusive license to sell

---

[3]    It is clear that this type of incident with a Barnes & Noble customer is likely to be the subject of the arbitration. That Manhattan Toy has not shown *irreparable* harm for purposes of this injunction does not affect the viability of Manhattan Toy's arbitration claims, including claims for any harm caused by AMB's conduct pending the arbitration hearing. Manhattan Toy has made clear that it is pursuing a damages claim, as well as declaratory relief, in arbitration. (Doc. No. 8, Pl.'s Mem. 26 n.4.) Thus, the proper remedy is in the arbitrator's hands.

Automoblox toys was not aided by its about-face on the subject of AMB's internet sales. In its written submissions to the Court, Manhattan Toy took the position that ". . . Automoblox is actively selling products on its website and through Amazon.com, in violation of Manhattan Toy's exclusive rights under the License Agreement." (Klein Aff. ¶ 29.) Manhattan Toy sought to enjoin AMB from making any such sales of Automoblox toys to consumers except for sales "directly to consumers who are members of an owner's club . . .." (Doc. No. 6, Pl's Mot. ¶ 4.) But at the preliminary injunction hearing, Manhattan Toy's President and CEO testified that AMB had been selling the complete line of Automoblox online to the public through its website from the inception of the parties' contractual relationship and that Manhattan Toy would not seek to enjoin this conduct by AMB here. Manhattan Toy's attorney then withdrew the request to enjoin AMB's internet sales, noting that whether these sales violate Manhattan Toy's License Agreement should be preserved for arbitration. At a minimum, this suggests that the boundaries of the License Agreement are not as clear as Manhattan Toy purported them to be. And Manhattan Toy's confusion regarding what type of AMB's conduct should now be enjoined illustrates why this Court should stay its hand from managing the parties' contractual relationship pending arbitration.

III.    **Enforceability of Proposed Injunction**

It appears to this Court that what concerns Manhattan Toy the most is not the imminent large-scale sales activity by AMB—which has no sales force or

resources to mount a sales campaign—but potential statements by AMB to third parties, especially toy store buyers, that Manhattan Toy's license rights have been terminated. To that effect, Manhattan Toy seeks to enjoin AMB from unspecified statements and communications "purporting to terminate, cancel, revoke or otherwise put an end to the License Agreement and First Amendment between Manhattan Toy and AMB. . . . [and from] stating, implying or otherwise communicating to any third part[ies] [which] . . .include, but are not limited to, actual and potential retail sellers of Automoblox products, actual and potential distributors of Automoblox products, actual and potential purchasers of Automoblox products, and actual and potential manufacturers of Automoblox products." (Pl.'s Proposed Order.)

Rule 65(d) of the Federal Rules of Civil Procedure provides that "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ." *Schmidt v. Lessard,* 414 U.S. 473, 476 (1974) (quoting Fed. R. Civ. P. 65(d)). The Supreme Court has emphasized that "the specificity requirements of Rule 65(d) are no mere technical requirements." *Id.* at 476. Rather, these requirements ensure that the parties—and any reviewing court—understand the scope of the injunction and the district court's reasons for believing injunctive relief was appropriate. "Rule 65(d)'s specificity requirement is designed to prevent uncertainty and confusion on the part of those to whom the

injunction is directed, to avoid the possible founding of contempt citations on an order that is too vague to be understood, and to ascertain that the appellate court knows precisely what it is reviewing." *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987) (citing *Schmidt,* 414 U.S. at 476-77)); *see also Daniels v. Woodbury County*, 742 F.2d 1128, 1134 (8th Cir. 1984) (same); *see also Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 632 (7th Cir. 2003) ("injunctions shall be specific in terms and shall describe in reasonable detail. . .the act or acts sought to be restrained") (quoting *Schmidt,* 414 U.S. at 476-477) (internal quotations omitted); *Corning Inc. v. PicVue Electronics, Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (same).

The broad-sweeping injunction sought by Manhattan Toy would cause this sort of uncertainly and confusion. For example, it is not clear whether a disclosure by AMB to a third party that the parties have a dispute regarding the validity of the License Agreement, or that there is an impending arbitration where AMB will take the position that the License Agreement is cancelled, falls within the conduct Manhattan Toy seeks to enjoin. And neither AMB nor the Court reviewing the injunction order would be able to ascertain just what conduct "purports" to terminate, cancel or end the parties' License Agreement.

Equally vague and unenforceable is Manhattan Toy's definition of "third parties" to whom this information could not be revealed under the preliminary injunction. Manhattan Toy defines third party as, among other things, "actual and potential consumers of Automoblox." As noted above, at the hearing Manhattan

Toy's CEO, Mike Klein, admitted that AMB has sold the full line of Automoblox products online to consumers since the inception of the License Agreement. Whether AMB would be enjoined from communicating with these "actual and potential purchasers of Automoblox" regarding any matters relating to the License Agreement is far from clear. In sum, the terms of Manhattan Toy's proposed injunctive relief at best are ambiguous and at worst meaningless in the context of what Manhattan Toy seeks to accomplish. And these terms are insufficient to prevent uncertainty and confusion on the part of AMB and to avoid the conduct that might result in a contempt citation.

Moreover, this Court would inevitably become entangled in the ongoing monitoring of AMB's communications with the marketplace, because as part of its injunctive relief, Manhattan Toy wants AMB to: "Provide Manhattan Toy, within 10 days of the date of this Order, with (1) a list of all retail sellers, distributors or others contacted by AMB, Calello or Brennan, to whom AMB, Calello, or Brennan stated or implied that Manhattan Toy was no longer the exclusive licensee of Automoblox products, or to whom AMB, Calello, or Brennan attempted to sell Automoblox products in competition with Manhattan Toy; and (2) a written statement, signed by Calello in his personal capacity and on behalf of AMB, stating that Manhattan Toy remains the exclusive licensee of Automoblox products." (Pl.'s Proposed Order; Pl's Mot. ¶ 6.) In addition to the administrative burden it would place on this Court, this type of involvement by the Court in the

day-to-day affairs of the parties would interfere with the role of the arbitrator, who is managing the pre-hearing phase of the arbitration.  (*See* Vitt Aff., Ex. 1.)

Beyond that, this Court notes that even without a court-ordered injunction, should AMB and Mr. Calello improperly interfere with Manhattan Toy's right to manufacture, market, and sell Automoblox during the next two months pending arbitration, they will face the consequences when the arbitrator adjudicates this matter in March 2011.  Indeed, the pendency of the arbitration hearing—and the arbitrator's management of pre-hearing discovery—is likely to deter all parties from engaging in conduct that would risk placing them at a disadvantage with the arbitrator.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant's Motion for Preliminary Injunction (Doc. No. 6), be

**DENIED.**

Date:  December 30, 2010

*s/Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 13, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **14 days** after service thereof.  All briefs filed under

this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.  Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.